## UNITED STATES DISTRICT COURT
## SOUTHER DISTRICT OF FLORIDA

| | | |
|---|---|---|
| DANA SOHOVICH, On Behalf of Herself and Others Similarly Situated, | ) ) | CIVIL ACTION NO. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CLASS ACTION |
| | ) | |
| MONAT GLOBAL CORP. and ALCORA CORPORATION a/k/a ALCORA GROUP, | ) ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

_____

### CLASS ACTION COMPLAINT

Plaintiff, Dana Sohovich ("Plaintiff"), individually and on behalf of a class of similarly situated persons, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, the investigation undertaken by Plaintiff's undersigned counsel, which included review and analysis of publicly available information.  Plaintiff believes that additional evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a class action against Monat Global Corp. ("Monat"), a seller of hair care products, and its corporate parent Alcora Corporation ("Alcora"), for violations of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*, ("FDUPTA" or the "Act"), and violations of the Florida False Advertising Statute, Fla. Stat. § 817.841.

2.      Plaintiff and other members of the class that Plaintiff seeks to represent (the "Class" as defined below) are purchasers of Monat hair care products who paid inflated prices

for products that were advertised to promote hair stability and growth, but instead provided no such benefit, and in fact caused significant hair loss to Plaintiff and others like her.  As described herein, within six to eight weeks after using Monat's products, Plaintiff experienced severe hair thinning and hair loss.  Plaintiff sought medical treatment and was told that she had lost **approximately 50% of her hair**, and that her hair loss was not being caused by any illness or identified medical condition, or by female pattern baldness.

3.      Monat is a "direct seller" or "multi-level marketer" company, meaning that it relies on its existing salespeople to recruit additional salespeople and promote its hair care products, largely through social media.  Monat's "Market Partners" promote and sell Monat's hair care products, frequently to family and friends, and actively recruit additional Market Partners into the company.

4.      As alleged herein, Monat has deceived, and continues to deceive unsuspecting consumers, including Plaintiff and other Class members.  Monat claims that "all products" in its various "treatment systems" contain the same proprietary formula and key ingredients, and that its products are " 'Guaranteed to deliver  Longer, Fuller, Stronger, Younger-Looking Hair In Just 90 Days.'"  Monat further claims, *inter alia,* that its hair care products are "safe," "non-toxic," intended to "reduce hair thinning," "suitable for all skin and hair types," and "boost hair strength, vitality and natural hair growth."

5.      These statements and others like them are false and misleading because Monat does not inform consumers of any risk of hair thinning or hair loss at the time of purchase, even though Monat is clearly aware of this known side-effect.  Not only is the Internet replete with claims of hair thinning and hair loss allegedly caused by Monat products, but only **after** Plaintiff complained of significant hair loss did a representative of Monat provide her with marketing

materials defensively claiming that product users may experience "some shedding" during the initial one-month "detoxifying" stage of product use.  Even these materials, however, falsely claimed that Monat products grow hair in stages, and that some users of Monat's products experience "new hair growth" during the second month "recovering" phase, and that "most" product users will experience "Noticeably greater hair growth" during the final "stabilizing" phase of product use.

6.     As a result of Monat's false and deceptive advertising, Plaintiff and other Class members purchased Monat products without being advised that these products can actually result in hair thinning and hair loss – the very conditions the products are sold to address.  Had Plaintiff, other Class members, or any reasonable consumer, known the true risks associated with Monat's products, they would not have purchased those products, or would not have paid the inflated prices of over $80 per bottle or system, which Monat charges.  If Monat were to disclose the true risks associated with its hair care products, consumers would be better able to make an informed choice about whether to purchase Monat products at the price of those products.

## JURISDICTION AND VENUE

7.     This court has subject matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (2005), amending 28 U.S.C. § 1332, at new subsection (d), conferring federal jurisdiction over class actions involving: (a) 100 or more members in the proposed class; (b) where at least some members of the proposed class have different citizenship from some defendants; and (c) where the claims of the proposed class members exceed the sum or value of five million dollars ($5,000,000) in the aggregate. 28 U.S.C. §§ 1332(d)(2) and (6).

8.     While the exact number of Class members is unknown at this time, Plaintiff has reason to believe that thousands of consumers purchased Monat's hair care products during the

relevant period. The number of Class members could be discerned from the records maintained by Monat.

9.      While the exact damages to Plaintiff and the members of the Class are unknown at this time, Plaintiff reasonably believes that their claims exceed five million dollars ($5,000,000) in the aggregate.

10.      This Court has personal jurisdiction over the parties because Plaintiff submits to the jurisdiction of this Court, and Defendants are incorporated and headquartered in the State of Florida and have purposefully availed themselves of the privilege of conducting business in the State of Florida.

11.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391. The acts and conduct complained of herein occurred in substantial part in this District. Furthermore, Defendants (a) have intentionally availed themselves of the laws and markets within this District through the promotion, marketing, distribution and sale of their products in this District; (b) do substantial business in this District, including maintaining their principal places of business in this District; and (c) are subject to personal jurisdiction in this District.

## **PARTIES**

12.      Plaintiff, Dana Sohovich, is a California resident who purchased Monat hair care products and was damaged thereby.

13.      Defendant Monat is a Florida corporation with its principal place of business at 3470 NW 82nd Avenue Suite 910, Doral, Florida 33122.

14.      Defendant Alcora is a Florida corporation which also maintains its principal place of business at 3470 NW 82nd Avenue, Suite 910, Doral, Florida 33122. Alcora is the parent company of Monat, and launched Monat in 2014.

## SUBSTANTIVE ALLEGATIONS

### A.      Monat is a Multi-Level-Marketing Company or "MLM"

15.     Alcora is a family-owned direct marketing business that founded Monat in 2014. According to its website, Alcora purports to be "a hub for the creation and development of products specifically aimed at making lives better for people everywhere, from our employees, to our independent distributors, to our consumers.  To achieve this, we stay open to change and see awesome opportunities in every challenge we encounter."  Alcora claims as its "first affirmation" that "we believe in evolution."

16.     Alcora was originally established in 2001 as a company called L'EUDINE Global, a direct sales company with offices in Maracaibo, Venezuela and Miami, Florida.  In 2008, the company was renamed as Alcora, and the name L'EUDINE now refers to a specific line of beauty products.

17.     On September 29, 2014, Alcora issued a press release announcing "the launch of a brand new Direct Selling Company, MONAT Global," which "will offer one of the most lucrative compensation plans in the U.S. Direct Selling Industry, while providing its Market Partners an opportunity to participate in the multi-billion-dollar hair care market.  MONAT will also inaugurate its elite Founders Club, which provides substantial business benefits to MONAT's new founding partners."[1]

18.     The press release quotes Alcora's Chairman as stating that "MONAT is the fulfillment of a lifelong dream to create an unparalleled business opportunity that would give both seasoned business professionals and young aspiring entrepreneurs a vehicle to achieve financial freedom and ongoing professional and personal growth."   The press release further

---

[1] A copy of the September 29, 2014 press release is attached hereto as Exhibit A.

states that Monat "provides ground-breaking opportunities through a novel Social Marketing approach to Direct Sales."

19.     Monat has no brick-and-mortar store and does not sell its products in traditional retail outlets such as Walmart or Target.  Instead, it sells hair care products using a direct sales model through its network of "Market Partners" that market and distribute Monat's products. Products may also be ordered through its website at https://corp.mymonat.com/shop/.

20.     A typical Market Partner offers potential customers several options for purchasing Monat products.  The most expensive option is for the customer to pay a "retail" price, an option that the Market Partner is likely to discourage because it means less commission for the Market Partner.  A second option is for the customer to join a "VIP program," which provides the customer with certain perquisites, such as coupon discounts or free shipping.  Customers who select this option are typically required to pay some type of enrollment fee, but receive additional discounts on Monat products if they recruit a certain number of friends who agree to become VIP customers as well.  The third purchase option is for the potential customer to become a full-fledged Market Partner like the person who is procuring the sale.  Customers who select this option typically pay a higher fee but are given greater discounts on future purchases.  These customers are provided with sample products and are typically paid a commission based on the sales they make to others.   A Market Partner told Plaintiff that Market Partners typically earn commissions of 35-45% of their sales.

21.     Companies that utilize this type of sales structure are sometimes referred to as "multi-level marketers" or "MLMs."  In January 2018, in response to a growing public concern about the potential for fraud and abuse concerning these types of companies, the Federal Trade Commission issued a document of non-binding guidance entitled "Business Guidance

Concerning Multi-Level Marketing."  In this document, the FTC described the prototype MLM structure by explaining that "[g]enerally, a multi-level marketer (MLM) distributes products or services through a network of salespeople who are not employees of the company and do not receive a salary or wage."  Moreover, an MLM typically "does not directly recruit its salesforce, but relies upon its existing salespeople to recruit additional salespeople, which creates multiple levels of "distributors" or "participants" organized in "downlines."  In its guidance, the FTC cautions that "[a]n MLM compensation structure that incentivizes participants to buy product and to recruit additional participants to buy product . . . poses particular risks of injury" because "a substantial percentage of participants will lose money." [2]

22.     The FTC also warns that while some MLMs sell "quality items at competitive prices," others "offer goods that are overpriced, have questionable merits, or are downright unsafe to use."[3]  In particular, the FTC advises that products "advertised as having 'miracle' ingredients or guaranteed results" are especially problematic, and that "[m]any of these 'quick cures' are unproven, fraudulently marketed, and useless" and "in fact, they could be dangerous."[4]

23.     According to the Better Business Bureau ("BBB") website, on September 26, 2016, the BBB sent correspondence to Monat requesting its cooperation in stopping "the pattern of complaints from consumers."  The BBB noted that it had received *445* complaints over the past three years alleging, among other things: that the terms and conditions of Monat's VIP auto-ship program are not clearly disclosed; that Consumers are unable to reach Monat to cancel their

---

[2]  https://www.ftc.gov/tips-advice/business-center/guidance/business-guidance-concerning-multi-level-marketing.

[3] FTC, Multilevel Marketing, https://www.consumer.ftc.gov/articles/0065-multilevel-marketing#Consider (last visited Feb. 9, 2018).

[4] *Id.*

automatic shipments from Monat; and that when consumers returned products and requested a refund, Monat had not complied.  The BBB also received numerous complaints about hair thinning and hair loss regarding Monat products.  On October 5, 2016, Monat responded to the BBB and provided information on steps it claims to be taking to address customer complaints. Since that time, however, the BBB has continued to receive complaints from Monat customers complaining of difficulty in canceling orders, difficulty in receiving refunds, and the effects of Monat products on customers' hair.  On February 7, 2018, for example, a consumer complained of "hair loss" that Monat "will not acknowledge" and accused Monat of "deleting negative reviews on their testimonies page."  Monat responded that it had no evidence that its products caused the hair loss and advised the consumer to follow its formal complaint process.[5]

> **B.     Monat Advertises that Its "Revolutionary" and "Clinically Proven" Products Strengthen Hair and Prevent Hair from Aging**

24.     According to the September 29, 2014 press release, the word "Monat" is derived from the words "Modern" and "Nature."  The press release claims that Monat's products are based on its own signature formula called "Rejuveniqe Oil Intensive" and that "[t]his revolutionary product is a clinically proven blend of rare, significantly potent botanical oils from different countries around the world that serve to enhance the effectiveness of its key ingredient, Abyssinian Oil."  According to the press release, the "MONAT Age Prevention Treatment Systems have been clinically proven to restore vitality to hair exposed to the damaging effects of sun, the environment, product use, chemical processes and aging, providing instant as well as

---

[5] BBB, https://www.bbb.org/south-east-florida/pages/business-reviews/skin-care/monat-global-in-doral-fl-90137286/reviews-and-complaints?noskin&cle%E2%80%A6 (last visited Feb. 12, 2018). After receiving a "F" rating recently, as of the date of this Complaint, the BBB now lists Monat as "NR" not rated and has removed the complaints from being easily accessible. *Id.*, https://www.bbb.org/south-east-florida/business-reviews/skin-care/monat-global-in-doral-fl-90137286 (last visited Feb. 13, 2018).

long-term benefits." The final sentence of the press release states that "[a]ll products" in Monat's various "Treatment Systems" are infused with Rejuveniqe, contain the same "key ingredients," and are "Guaranteed to deliver 'Longer, Fuller, Stronger, Younger-Looking Hair In Just 90 Days.'"

25.    In the "Science" section of Monat's website, Monat claims its products are based on clinically proven results and that its "ingredients are naturally-based, safe, pure and sustainable . . . these naturally-based ingredients work in harmony with each other, combining and reacting to pump up their natural properties to take MONAT to the next level."[6]

26.    Monat's signature product, Rejuveniqe Oil Intensive, retails at $99 or $84 for VIPs. This Oil is touted as a formula of molecular ingredients that replace the body's own natural oils to "reduce hair thinning, prevent oxidative stress, and add incredible volume with long-lasting shine. All without the damaging effects of silicone."[7]

27.    The Hydration System, which retails at $99 or VIP at $84, includes Renew Shampoo, Replenish Masque and Restore Leave-In Condition that Monat claims "will restore [hair] to its bouncy, shiny, and vibrant state." Monat invites consumers to find out more by contacting your MONAT Market Partner.[8]

28.    The Renew Shampoo, which retails for $35 or $30 for VIPs, is advertised as a "salt and sulfate-free gentle, hydrating cleanser that penetrates and moisturizes the scalp. Helps *boost natural hair growth and improves follicle strength to aid in reducing hair thinning*.

[6] Monat, Science of Monat, https://monatglobal.com/the-science-of-monat/ (last visited Feb. 12, 2018).

[7] Monat, Rejuveniqe Oil Intensive, https://monatglobal.com/rejuveniqe-tm-oil-intensive/ (last visited Feb. 12, 2018)

[8] Monat, Hydration System, https://monatglobal.com/hydration-system/ (last visited Feb. 12, 2018).

Supports the restoration of the hair's youthful vitality by adding essential moisture back into the hair.  Safe to use on colored and/or chemically treated hair and extensions."[9]

29.     The Replenish Masque, which retails for $50 or $43 for VIPs, is advertised as "ideal for damaged and moisture-starved hair that penetrates and nurtures the scalp while *helping boost natural hair growth, improve follicle strength and reduce hair thinning*.  Infuses essential moisture and delivers vital nutrients to help eliminate frizz and reduce split ends. Hair is left silky, more manageable and youthful looking. Safe to use on colored or chemically treated hair and extensions."[10]

30.     The Restore Leave-In Conditioner, which retails for $33 or $28 for VIPs, is advertised as "designed to revive each hair strand using the same proven ingredients and technologies as MONAT Renew Hydrating Shampoo and Masque. Helps restore essential nutrients to the scalp, *boosting natural hair growth and improving follicle strength to reduce hair thinning*.  Tames frizz and flyaways; leaving fragile hair silky, youthful and supple."[11]

31.     Touted by Monat Market Partners as its best product line, the Black System, also referred to as the Classic Confidence System in marketing materials, retails for $99 or VIP at $84. It features a Shampoo + Conditioner, which retails at $38 or $32 for VIPs.  Monat claims this product is "[a] complete 2-in-1 system that cleanses and conditions while maintaining essential moisture balance for youthful, healthy hair.  *Penetrates and nurtures the scalp while helping boost natural hair growth and improving follicle strength to reduce hair thinning*."

---

[9] Monat, Renew Shampoo, https://monatglobal.com/renew-shampoo/ (last visited Feb. 12, 2018) (emphasis added).

[10] Monat, Replenish Masque, https://monatglobal.com/replenish-masque/ (last visited Feb. 12, 2018) (emphasis added).

[11] Monat, Restore Leave-In Conditioner, https://monatglobal.com/restore-leave-in-conditioner-2/ (last visited Feb. 12, 2018) (emphasis added).

Monat identifies the key ingredients in the Shampoo + Conditioner as PROCATALINE™, which "[h]elps maintain healthy levels of antioxidants in follicles to **combat premature thinning** while protecting color and shine;" CAPIXYL™, which "[h]elps reduce scalp inflammation, **strengthens and thickens hair while stimulating natural growth**;" REJUVENIQE™, which is "MONAT's own proprietary blend of unique oils containing essential powerfully active botanical ingredients;" and CRODASORB™, a "UV absorber that helps protect hair from sun damage." [12]

32.    Monat's website also contains "before and after" photos of users of its products. It also contains written statements that purportedly back up its claim that its hair products allow customers to "[d]iscover visibly longer, fuller, stronger, younger-looking hair."[13]

33.    Monat trains Market Partners to personally deliver these promotional advertisements and marketing messages to sell its products to customers, by methods including but not limited to, in-person parties, direct messaging of these statements to people they know, and posts on social media, including Facebook and Instagram.

34.    For example, on August 29, 2017, before her purchase of Monat, Plaintiff viewed the following Facebook post by a Market Partner that said:

Monat Quick Facts:

*Natural-based, Gluten Free, Vegan ☘

*Anti-aging Hair Care Line

*Made in USA ᴜꜱ

---

[12] Monat, Black Shampoo + Conditioner, https://monatglobal.com/monat-black-shampoo-conditioner/ (last visited Feb. 12, 2018) (emphasis added).

[13] Monat, Results, https://monatglobal.com/results-2/ (last visited Feb. 13, 2018).

*Has had 900% growth in last 10 months 👀

*Less than 1% return rate in first 30 days

*Offers products for men, women and children

*Replenishes and restores hair issues such as: hair loss, breakage, brassy color, psoriasis, ineffective growth, dullness, excessive oil, thinning, and dandruff*.

35.     On September 10, 2017, Plaintiff also viewed this post on Facebook by a Market Partner, which contained these "before and after" photos purportedly showing dramatic hair growth from the use of Monat products:

Are you experiencing hair loss? Guess what, it happens to a variety of people for a variety of reasons. Let me help you!!!

There is a great special running through tomorrow 🎉🎉

Let's chat about getting you that hair back! 🙋‍♀️🧍🖤🤗



36.     Plaintiff also saw the following advertisements repeatedly on social media during the time of her purchase and use of the products, specifically relating to the Black Shampoo + Conditioner:



37.     On December 17, 2017, Plaintiff viewed the Market Partner's post on Facebook that Monat is endorsed by the National Hair Loss Association.

38.     After viewing the Market Partner's posts on social media and speaking with her about the products, Plaintiff also visited Monat's website to learn more about its products, both before making her purchases and during her use of the products.

**C.     Plaintiff Experiences Severe Hair Thinning and Hair Loss After Using Monat's Hair Care Products**

39.     During the relevant period, Plaintiff was exposed to and saw Monat's deceptive marketing claims that its products strengthened hair, prevented hair from aging and promoted hair growth.  These advertisements also failed to disclose the risk of hair thinning and hair loss.

40.     On September 15, 2017, after being solicited by her friend, a Monat Market Partner, Plaintiff agreed to register as a VIP for $19.99 and purchase the Hydration System, which included the Renew Shampoo, Replenish Masque and Restore Leave-In Conditioner for $84.00.  She also received a Thickening Spray Flyer and Curl Cream.  On September 17, 2017,

the Market Partner placed the order for Plaintiff, who did not sign any agreement with Monat, for a total of $114.55, which also included tax and handling cost.  Soon thereafter, Plaintiff received by mail the items she ordered and began using them.

41.     On September 21, 2017, Plaintiff, at her Market Partner's request, hosted a Monat party in San Diego, California.  At the party, the Market Partner told Plaintiff that Rejuveniqe oil would help her psoriasis flare ups, dryness and flaking.  The Market Partner also told Plaintiff that the Black line was Monat's best product for both men and women.  The Market Partner gave Plaintiff a free bottle of Black Shampoo for hosting the party, which Plaintiff started to use.

42.     On October 9, 2017, Plaintiff ordered the Black System including the Shampoo + Conditioner.

43.     On October 27, 2017, Brandi Bottorff ("Bottorff"), a Monat Executive Director and "Founder" (a title given to very senior Market Partners who have purportedly obtained "elite" status), came to an event for Monat hosted in San Diego, California.  Plaintiff was invited to this event by her Market Partner but did not attend.

44.     On or about November 14, 2017 through November 24, 2017, almost two months after she started using Black Shampoo + Conditioner, Restore Leave-In Conditioner and Rejuveniqe Oil Intensive, Plaintiff noticed extreme hair loss, most notably when washing and combing her hair.  Plaintiff's mother in law, who was visiting at the time, commented that she noticed the large amount of hair Plaintiff was losing.

45.     On December 7, 2017, Plaintiff visited her dermatologist because of a psoriasis flare up and dry, burning scalp.  Her doctor prescribed different psoriasis medication.

46.     On December 28, 2017 and January 3, 2018, Plaintiff called her dermatologist about her hair loss.  The dermatologist told Plaintiff to stop using Black Shampoo + Conditioner. He said Plaintiff did not have any signs of female pattern baldness.

47.     On January 9, 2018, Plaintiff's hairstylist commented on how much thinner Plaintiff's hair was since her last visit.

48.     On December 27, 2017, Plaintiff called her OBGYN about her sudden hair loss. Plaintiff's OBGYN ordered laboratory blood tests for Plaintiff, which came back normal.

49.     On or about January 15, 2018, Plaintiff visited her primary care physician, who ordered additional laboratory testing to determine the reason for Plaintiff's sudden hair loss.  All of the results came back normal.

50.     On or about January 15, 2018, Plaintiff informed the Market Partner about Plaintiff's sudden hair loss and asked if this was typical for use of the products.

51.     From January 17 to January 31, 2018, the Market Partner and Bottorff, chatted with Plaintiff about her hair loss.  They suggested that it could have been caused by sickness, weight loss or gain, vitamins or supplements, or her prior hair products, even though Plaintiff had never experienced hair loss and the only change in her life and daily routine was that she had begun using Monat products.  The Market Partner and Bottorff denied that Plaintiff's hair loss had anything to do with Monat, and even encouraged Plaintiff to continue using the Monat products and to purchase additional products.

52.     On January 18, 2018, Bottorff texted the below information to Plaintiff, informing Plaintiff for the first time that during the first month of using Monat's products, the so-called "detoxifying period," some people may experience itching, flaking, dryness or stickiness and shedding:



53.     Not only did Monat provide Plaintiff with these defensive representations only *after* Plaintiff complained of significant hair loss, but these materials were also themselves misleading, falsely claiming that Monat products grow hair in stages, and that some users

experience "New hair growth" during the so-called "recovering" phase, and most users experience "Noticeably greater hair growth" during the so-called "stabilizing" phase.

54.     On January 26 and January 30, 2018, Plaintiff, as directed by Monat, tried to call Monat to cancel her order and receive a refund.  Each time she called, Plaintiff was put on hold for over one hour, just as other consumers had experienced and noted in their complaints to the BBB.  Finally, on January 31, 2018, Plaintiff was able to get through to Monat and cancel her monthly "Flexship" order.  She was offered a 90% refund on products that were unused and able to be resold.

55.     During the period from February 5 through February 7, 2018, Plaintiff asked the Market Partner if Monat had any guidelines on when her hair might grow back, as she was still losing a lot of hair.  The Market Partner said she was shocked by the pictures of Plaintiff's hair loss, and said that the products should be out of her system and "detox" should be over.  The Market Partner did not have any response from Monat to help Plaintiff, except to provide Plaintiff with a statement from Monat stating that nothing is wrong with the products and that the ingredients therein do not damage hair.  Instead, Monat stated that with every product some people will have sensitivities, but that does not mean the product line is bad.  The Market Partner also provided Plaintiff with a link to Monat's new website: www.truthaboutmonat.com.

56.     On February 9, 2018, Plaintiff returned to her dermatologist because she was continuing to lose hair - even after stopping use of Monat's products over *one month* earlier as the dermatologist had instructed.  The dermatologist reviewed Monat's hair product bottles and, based on the disclosed ingredients, said the products were plant-based, but also full of added chemicals.  He said Plaintiff had *lost 50% of her hair*, and he did not know how to stop the hair loss process.

57.     Between September 17, 2017, and approximately January 3, 2018, Plaintiff spent approximately $234.50 on the Monat products described above.  Plaintiff decided to purchase Monat's products because she wanted thicker, fuller hair and believed that Monat's products were designed to improve the thickness and fullness of her hair.  Had Monat disclosed the risks of hair thinning and hair loss associated with its products, Plaintiff would have been aware of these risks and would not have purchased Monat's products, or would not have paid the price she paid.  In the future, if Monat were to disclose these risks, Plaintiff and others would be in a position to make an informed decision as to whether to purchase Monat's products at the prices offered.

**D.     Plaintiff's Claims Are Not Unique**

58.     Plaintiff's experience is by no means a unique or isolated occurrence.  Indeed, the very fact that Monat provided Plaintiff with materials mentioning possible "shedding" only ***after*** Plaintiff complained of significant hair loss demonstrates that Monat was well aware of this side effect of its products.

59.     Moreover, the Internet is replete with comments and complaints from users of Monat's products who claim to have had experiences similar to Plaintiff's.

60.     In December 2017, a group of consumers formed a Facebook closed (non-public) group called "Monat – My Modern Nightmare."  As of the date of this Complaint, the group has over 15,000 members, many of whom have commented about similar experiences to Plaintiff's sudden hair loss after using Monat's hair products.[14]

61.     The founder of the Facebook group, Vickie Harrington, claims to have had an experience with Monat products similar to Plaintiff's.  Harrington claims that after using

---

[14] Buzzfeed, Monat, https://www.buzzfeed.com/stephaniemcneal/monat?utm_term= ilWbm OE4KX#.krp6nDoZa4 (last visited Feb. 13, 2018).

Monat's products during 2017, she experienced sudden hair loss and was told by her neighbor, from whom she had purchased the products, that hair loss was part of the product's "detox." Harrington claims she did not make any changes in her lifestyle that could have caused her hair loss and received a clean bill of health at her primary care physician after a complete physical.[15]

62.     Harrington herself is a former Market Partner and is being sued by Monat for defamation in connection with her Facebook group, allegations which she denies.[16]  Monat is also suing at least one other user of its products for defamation as well.[17]

63.     Another consumer who used Monat's products from July 2017 to January 2018, said that she "started experiencing an extremely itchy scalp, it wouldn't stop," which left her with "leakage and sores all over my head."  She claims to have no known medical conditions and has not made any lifestyle changes that could have caused this problem.  She further claims that her scalp has improved since she stopped using Monat's products.[18]

64.     Others have claimed that Monat's products thinned their hair so much that they were forced to cut a large amount of their hair off.  Still others experienced welts and sores on their scalps after using Monat's products.[19]  When interviewed about these allegations of hair loss, the President of Monat reportedly replied that "the average person sheds 150 hairs a day anyway."[20]

---

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

65.     When contacted by customers expressing concerns about hair loss and sores, like Plaintiff, many Market Partners for the first time describe the "detox" process they claim the customer is experiencing.  At this point, the Market Partners also share the image that Plaintiff received from Bottorff, which encourages the customer to continue using Monat's products even after experiencing hair loss and scalp bleeding, often causing further hair loss and discomfort.[21]

66.     As of the filing of this Complaint, Trustpilot.com, an online review community, has posted over 150 reviews of Monat products, many of which contain claims substantially similar to Plaintiff's.  One reviewer, for example, posted on February 15, 2018, that: "I used these products for 5 months and they RUINED my hair. It fell out in clumps and broke off. My beautiful thick wavy hair is a thin and damaged mess. And if they try to tell you it's "detox" laugh in their face. That's the most ridiculous thing I've ever heard. This company is a scam."[22]

67.     Similarly, another reviewer posing on February 14, 2018 wrote: "I really can't believe this is happening, but I have lost massive amounts of hair and had major scalp burning due to this product.  Please beware that this is a common reaction to Monat Hair care.  I am a real person & this, unfortunately, is my story with this product. I sure wish there were more reviews out back when I was told this was "detox" and thought I was losing my mind. Buyer Beware."[23]

68.     In addition to the various blog and Internet complaints, numerous Monat customers have posted videos on YouTube complaining of hair thinning, hair loss, scalp damage, and related issues.  Some of these videos are posted by individuals who claim to have sold Monat

---

[21] *Id.*

[22] https://www.trustpilot.com/review/monatglobal.com.

[23] *Id.*

20

products, and some are posted by consumers who claim their complaints of hair loss were dismissed by Monat as part of the "detox" process.

69.     Despite the widespread nature of these complaints, Defendants continue to hide the true risks and side-effects associated with their products, and seek to intimidate their critics with litigation, all while continuing to reap large profits at the expense of unsuspecting consumers.

## CLASS ACTION ALLEGATIONS

70.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure (the "Rules") on behalf of a class consisting of all persons, exclusive of Defendants and their employees, who purchased in the United States, one or more hair care products sold by Defendants from February 13, 2014 through the present day (the "Class").

71.     ***Numerosity – Rule 23(a)(1).***  The members of the Class are so numerous that their individual joinder is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are thousands of members in the proposed Class based, *inter alia,* upon Monat's publicly projected revenues of $300 million for fiscal year 2017.  The proposed Class may be identified from records maintained by Defendants.

72.     ***Common Questions of Law and Fact – Rule 23(a)(2).***  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are the following:

        a.   Whether the statements made by Defendants as part of the advertising for

Defendants' hair care products discussed herein are true, or are reasonably likely to deceive, given the omissions of material fact described above;

b. Whether Defendants violated the provisions of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*;

c. Whether Defendants violated the provisions of the Florida Misleading Advertising Statute, Fla. Stat. § 817.41;

d. Whether and to what extent Plaintiff and members of the Class have been damaged by Defendants' conduct and the proper measure of damages; and

e. Whether Plaintiff and the Class are entitled to injunctive relief, restitution or other equitable relief and/or other relief as may be proper.

73.     ***Typicality – Rule 23(a)(3).***  Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class have been subject to and affected by the same conduct and omissions by Defendants.   The claims alleged herein are based on the same violations by Defendants that harmed Plaintiff and the members of the Class.   By purchasing Defendants' hair care products during the relevant time period, all members of the Class were subjected to the same wrongful conduct.   Plaintiff's claims are typical of the Class' claims and do not conflict with the interests of any other Class members.   Defendants' unlawful, unfair, deceptive, and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced.

74.     ***Adequacy – Rule 23(a)(4).***  Plaintiff will fairly and adequately protect the interests of the members of the Class.   Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no adverse or antagonistic interests to those of the Class.

22

75.     ***Injunctive and Declaratory Relief – Rule 23(b)(2).***  Defendants' actions regarding the deceptions and omissions concerning their hair care products are uniform as to members of the Class.  Defendants have acted or have refused to act on grounds that apply generally to the Class, so that final injunctive relief as requested herein is appropriate for the Class as a whole.

76.     ***Predominance and Superiority of Class Actions – Rule 23(b)(3).***  Questions of law or fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other methods for the fast and efficient adjudication of this controversy, for at least the following reasons:  (a) absent a class action, members of the Class as a practical matter will be unable to obtain redress, Defendants' violations of their legal obligations will continue without remedy, additional consumers will be harmed, and Defendants will continue to retain their ill-gotten gains; (b) it would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions; (c) when the liability of Defendants has been adjudicated, the Court will be able to determine the claims of all members of the Class; (d) a class action will permit an orderly and expeditious administration of the claims of each member of the Class and foster economies of time, effort, and expense; (e) a class action regarding the issues in this case does not create any problems of manageability; and (f) Defendants have acted on grounds generally applicable to all members of the Class, making class-wide monetary relief appropriate.

77.     Plaintiff does not contemplate class notice if the Class is certified under Rule 23(b)(2), which does not require notice. However, notice to the putative Class may be accomplished through publication, signs or placards at the point-of-sale, or other forms of distribution, if necessary, if the Class is certified under Rule 23(b)(3), or if the Court otherwise

determines that notice is required.  Plaintiff will, if notice is so required, confer with Defendants and seek to present the Court with a stipulation and proposed order on the details of a class notice program.

**FIRST CAUSE OF ACTION**
**For Violation of the Florida Deceptive and Unfair Trade Practices Act,**
**("FDUTPA"), Fla. Stat. § 501.201 *et seq.*,**
**On Behalf of Plaintiff and the Class against Defendants**

78.     Plaintiff incorporates the above paragraphs by reference as if set forth fully herein.

79.     This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, et seq. ("FDUTPA" or the "Act").  The stated purpose of the Act is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."  Fla. Stat. §501.202(2).

80.     By its own terms, the Act is to be "construed liberally" to promote certain pubic policies, including "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.202(2).

81.     Plaintiff and Class members are "consumers" as defined by Fla. Stat. § 501.203(7).

82.     Monat is a "person" within the meaning of the Act and was subject, at all relevant times, to the requirements and proscriptions of the Act with respect to all of their business and trade practices enunciated herein.

24

83.     Alcora is a "person" within the meaning of the Act and was subject, at all relevant times, to the requirements and proscriptions of the Act with respect to all of their business and trade practices enunciated herein.

84.     Defendants' advertising and sale of their hair care products, and the purchase of those products by Plaintiff and other Class members, constitute "trade or commerce" as defined by Fla. Stat. § 501.203(8).

85.     Defendants falsely represent that their hair care products promote hair strengthening and growth, and omits that its products may actually cause hair thinning and hair loss.

86.     Defendants made these misrepresentations and omissions in written advertising materials presented to Plaintiff and other Class members at the time of purchase, in printed advertisement on Defendants' website, directly on the packaging of Defendants' hair care products and through its Market Partners who described the products directly and posted information about them on their social media.

87.     Defendants' representations are deceptive in that they are likely to mislead a consumer, who is acting reasonably under the circumstances, as to the effectiveness and possible side effects of their products to the detriment of that consumer.

88.     Defendants' representations as set forth herein are unfair in that they offend established public policy against deceptive practices as set forth in the Act.

89.     Defendants' representations as set forth herein are otherwise immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, because Defendants knowingly failed to disclose risks that it knew or should have known about in its hair care products that were not readily discoverable by consumers at the time of purchase, namely the risks of thinning

hair and hair loss, which if properly disclosed would have diminished the value of Defendants' products.

90.     By reason of the conduct alleged herein, Defendants violated the Act.

91.     Defendants' unconscionable, unfair, and deceptive acts and practices, as alleged herein, caused Plaintiff and the Class to suffer harm and actual damages.

92.     Plaintiff and the Class have suffered actual damages as a result of Defendants' violations of FDUTPA in that they incurred the costs of insufficient product value when purchasing Defendants' products.

93.     Plaintiff and other Class members suffered additional harm by being exposed to the risks of harmful and deleterious side effects of Defendants' products, including thinning hair and hair loss.

94.     Plaintiff and members of the Class are entitled to recover actual damages to the extent permitted by law, in an amount to be proven at trial, and are further entitled to equitable relief to enjoin Defendants on terms that the Court considers reasonable and appropriate.

**SECOND CAUSE OF ACTION**
**Violation of the Florida False Advertising Statute, Fla. Stat. § 817.41**
**On Behalf of Plaintiff and the Class against Defendants**

95.     Plaintiff incorporates the above paragraphs by reference as if set forth fully herein.

96.     Florida's prohibition on misleading advertising, Fla. Stat. § 817.41 (1), states that "[i]t shall be unlawful for any person to make or disseminate or cause to be made or disseminated before the general public of the state, or any portion thereof, any misleading advertisement.  Such marketing or dissemination of misleading advertising shall constitute and is hereby declared to be fraudulent and unlawful, designed and intended for obtaining money or property under false pretenses."

97.     Defendants' misrepresentations regarding the hair strengthening and anti-aging characteristics of their hair care products, and Defendants' omission of any statements concerning the risks of hair thinning and hair loss, constitute violations of Florida's prohibition on misleading advertising under Fla. Stat. § 817.41(1).

98.     Defendants knew, or should have known, about the risks of hair thinning and hair loss associated with its hair care products because Monat purports to be a "world-class designer, manufacturer and distributor of hair care and personal products." Defendants also should have known of the risks of hair thinning and hair loss from the use of its products by virtue of the complaints Defendants received from its customers, and comments on the Internet and various social media outlets.

99.     Defendants intended that their misrepresentations about their hair care products would induce consumers like Plaintiff and other Class members to purchase these products. Indeed, the hair-strengthening claims are the primary reason why potential customers would purchase Defendants' products.

100.    Plaintiff and other members of the Class suffered injury when they justifiably relied on Defendants' representations. The risks of hair thinning and hair loss from the use of Defendants' products rendered these products valueless and unusable for the purpose for which they were purchased, or at the very least significantly lowered the value of these products.

101.    As a direct and proximate result of Defendants' misleading advertising concerning its hair care products, Plaintiff and other Class members have suffered and will continue to suffer damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

a.   Declaring this action to be a proper class action and certifying Plaintiff as Class representative and Plaintiff's counsel as Class counsel;

b.   Declaring that Defendants violated the FDUPTA and/or Florida's prohibition on misleading advertising;

c.   Awarding damages to Plaintiff and other members of the Class, and against Defendants, in an amount to be proven at trial, and including exemplary and punitive damages in order to prevent and deter Defendants from any future unlawful conduct;

d.   Providing restitution to Plaintiff and the Class for any wrongful act or practice under each cause of action where such relief is permitted;

e.   Enjoining Defendants from continuing the unlawful practices as set forth herein, including marketing or selling their hair care products without disclosing the potential health risks relating thereto, and directing Defendants to engage in corrective action, or providing other injunctive or equitable relief;

f.   Awarding Plaintiff and other Class members pre-judgment and post-judgment interest, as well as reasonable attorneys' fees and expenses incurred in this action, including expert and witness fees and other costs and disbursements; and

g.   Awarding Plaintiff and other members of the Class such further relief as the Court may be just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: February 16, 2018                    Respectfully submitted,


By:*/s/ Adam Warden*
**SAXENA WHITE P.A.**
Joseph E. White, III (FL Bar No. 0621064)
jwhite@saxenawhite.com
Adam D. Warden (FL Bar No. 0873691)
awarden@saxenwhite.com
Dianne M. Anderson (FL Bar No. 103670
danderson@saxenawhite.com
150 East Palmetto Park Road, Suite 600
Boca Raton, FL 33432
T: (561) 394-3399
F: (561) 394-3382


Jessica Sleater (*Pro Hac Vice* to be filed)
**ANDERSEN SLEATER SIANNI LLC**
1250 Broadway, 27th Floor
New York, NY  10001
Tel: (646) 599-9848

jessica@andersensleater.com


*Attorneys for Plaintiff*

# EXHIBIT A



# The Alcora Group Launches MONAT® Global

September 29th, 2014- Mr. Luis Urdaneta, Chairman of the Board of the ALCORA Group is delighted, after much anticipation, to announce the launch of brand new Direct Selling Company, MONAT Global. This launch, which will take place on October 1st, will offer one of the most lucrative compensation plans in the U.S. Direct Selling industry, while providing its Market Partners an opportunity to participate in the multi-billion dollar hair care market. With this launch, MONAT will also inaugurate its elite Founders Club, which provides substantial business benefits to MONAT's new founding partners.

MONAT Global is the newest organization for, and a wholly owned subsidiary of, Alcora Corp. In addition to MONAT Global, their holdings include L'EUDINE Global, an established Direct Selling company specializing in premium beauty and wellness products throughout the US and Latin America and B&R Products, their research, development and manufacturing Laboratory subsidiary. All three companies are headquartered in and around Miami, Florida.

"MONAT is the fulfillment of a lifelong dream to create an unparalleled business opportunity that would give both seasoned business professionals and young aspiring entrepreneurs a vehicle to achieve financial freedom and ongoing professional and personal growth", said Mr. Urdaneta.  "To be truly successful, you need to invest in the success of those around you", he added.

The Direct Sales Industry continues to grow and has increased its sales force to a record high of 16.8 million individuals in the US in 2013, according to the Direct Selling Association. Retail sales through the direct selling channel reached $32.67 in the U.S. in 2013.

Mr. Urdaneta believes that putting the right people in place is the key to the success of any organization. In this regard, he is delighted to partner with his son Mr. Rayner Urdaneta as CEO. Rayner Urdaneta, a graduate of Florida International University, worked with Luis to found and build the Alcora Group through the development of the L'EUDINE brand and strategic acquisitions to support this growth. In addition, they most recently added Mr. Stuart MacMillan as President of MONAT Global, bringing with him many years of success in the Direct Selling Industry. Together this trio believes they have the underpinnings of what they believe will be a powerful entry into the US Market.

"With the combined experience of over one hundred years in the Direct Selling Industry and a clean slate, we believe we have created one of the best Direct Selling business opportunities to come to the U.S. and potentially the world in a very long time", says Stuart MacMillan, President of MONAT Global. "The response and excitement in prelaunch has been beyond our expectations and we are eager to leverage the skills and experience of our Market Partner Founders", MacMillan added.

"We are seeking top industry leaders and visionaries to join our company's exclusive Founders Club", says Rayner Urdaneta, CEO of MONAT Global. "This is the moment to jump on board as our Founders have not only the opportunity to participate in exclusive rewards but also to help shape this organization".

**The Products**

"Through extensive clinical research we have combined ultra-progressive active botanical ingredients with state-of-the-art scientific technologies to create safe, high-quality, naturally based, age-prevention products", says Jamie Ross, Senior VP of Research and Development of MONAT Global. This was precisely the inspiration behind the compound name MONAT, derived from the words Modern and Nature.

"As a company and as a family that honors integrity, we feel it is our responsibility to offer products that meet only the highest quality standards and are made only with safe ingredients", stated Mr. Urdaneta.

The MONAT Age Prevention Treatment Systems have been clinically proven to restore vitality to hair exposed to the damaging effects of sun, the environment, product use, chemical processes and aging, providing instant as well as long-term benefits.

MONAT holds its own signature formula, Rejuveniqe™ Oil Intensive. This revolutionary product is a clinically proven blend of rare, significantly potent botanical oils from different countries around the world that serve to enhance the effectiveness of its key ingredient, Abyssinian Oil. This carefully crafted collaboration of science and nature allows MONAT to offer an unparalleled and unique age prevention hair and skin care experience, providing vitamins, minerals, antioxidants, beta-carotene, omega 3 fatty acids, nutrients, and amino acids.

All products from the three MONAT Treatment Systems -Balance, Volume, and Men's 2+1- are infused with Rejuveniqe™ and key ingredients Capixyl™ (Red Clover Extract), Procataline™ (Pea Extact), and Crodasorb™ (a UV absorber). Guaranteed to deliver "Longer, Fuller, Stronger, Younger-Looking Hair in Just 90 Days".

**About MONAT® Global**

MONAT Global is a wholly owned subsidiary of Alcora Corp., whose holdings include L'EUDINE Global, an established Direct Selling company specializing in premium beauty and wellness products throughout the US and Latin America and B&R Products, their research, development and manufacturing Laboratory subsidiary. All three companies are headquartered in and around Miami, Florida. MONAT was founded in 2014 to enter the multi-billion dollar hair care market and provides ground-breaking opportunities through a novel Social Marketing approach to Direct Sales. The company offers a unique and exciting business model and one of the most generous compensation plans in the U.S.

market. MONAT holds its own signature formula, Rejuveniqe™ Oil Intensive. This revolutionary product combines the perfect blend of rare, distinctive oils from different countries around the world, conceived and produced using the latest scientific technologies and clinically proven proprietary ingredients. This carefully crafted collaboration of science and nature allows MONAT to provide an unparalleled and unique age prevention hair and skin care experience. In-depth information about MONAT and its product lines will be available at www.monatglobal.com on October 1st 2014.

Frances Salichs

Public Relations Manager

frances@monatglobal.com

**305.392.2999**